**Joseph M. Alioto,** SBN #42680,
*Admitted Pro hac vice*
jmalioto@aliotolaw.com
**ALIOTO LAW FIRM**
One Sansome Street
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200

**Christopher L. Cauble,** OSB No. 962374
ccauble@thecaublefirm.com
**Rachele R. Selvig,** OSB No. 095016
rselvig@thecaublefirm.com
**CAUBLE, CAUBLE & SELVIG, LLP**
111 SE Sixth Street
Grants Pass, OR  97526
Telephone: (541) 476-8825
Facsimile: (541) 471-1704

**SEVERAID & GLAHN, PC**
**Ronald H. Severaid,** CSBN #78923, Pro hac vice pending
Rhseveraid@sbcglobal.net
**Carter Glahn,** CSBN #242378, Pro hac vice pending
cglahn@sbcglobal.net
1787 Tribute Road, Suite D
Sacramento, CA 95815
916-929-8383 Phone/916-925-4763 Fax

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# MEDFORD DIVISION

| | |
|---|---|
| TALK RADIO NETWORK ENTERPRISES, LLC. an Oregon limited liability company; AMERICA'S TALK NETWORK, INC., an Oregon corporation; AMERICA'S LIFESTYLE RADIO NETWORK, INC., an Oregon corporation; and TALK RADIO NETWORK ENTERTAINMENT, INC., an Oregon corporation;<br><br>                              Plaintiffs,<br><br>              v.<br><br>CUMULUS MEDIA, INC., a Delaware corporation; WESTWOOD ONE, INC., a Delaware corporation; COMPASS MEDIA | Case No.:<br><br>**COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, CONVERSION, BREACH OF FIDUCIARY DUTY, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS** |

NETWORKS, LLC, a Delaware limited liability
company; COMPASS MEDIA MARKETING,
LLC, a Delaware limited liability company;
WYD MEDIA MANAGEMENT, LLC, a
Connecticut limited liability company; WYM
MEDIA MANAGEMENT, LLC, a Connecticut
limited liability company; LEWIS W. DICKEY,
JR.; and CHARLES STEINHAUER;

**JURY TRIAL DEMANDED**

Defendants.

# INTRODUCTION

1.      The above-captioned action (this **"Action"**) arises out of multiple
mergers, acquisitions and agreements through which the defendants in this Action
(**"Defendants"**) have taken control of, gained market power in, or benefitted from
control of, two markets:  (i) the market within the United States of America for
services of advertising representatives willing to provide ad rep services with
respect to news radio and talk radio programming that is produced for syndication
in the national radio market by  companies which are not radio station owners and
are not affiliates of any such station owners (the **"Independent National
Syndication Ad Rep Market"**);  and (ii) the market within the United States of
America for distribution of spoken word news and/or talk content by a producer or
syndicator via individual terrestrial radio stations, which then broadcast such
programming in their local markets (the **"News/Talk Radio Spoken Word
Content Intellectual Property Market"**).   This Action also arises out of
continuing actions by Defendants, after February 28, 2014, to further increase their
market power in the Independent National Syndication Ad Rep Market and the
News/Talk Radio Spoken Word Content Intellectual Property Market (the
**"Subject Markets"**) by ongoing unlawful, improper, unfair and anticompetitive
actions, as hereinafter alleged, and by unlawful, wrongful and improper use of
leverage based upon the market power of defendant CUMULUS MEDIA, INC.
(**"Cumulus"**) in yet a third radio market – ownership of AM and FM terrestrial

radio stations within the United States of America - which Cumulus obtained by multiple mergers and acquisitions. In this latter regard, Cumulus has become one of the largest terrestrial radio station owners in the United States in terms of total stations and total markets, and the primary radio station owner in the United States in terms of strength of markets and strength of stations within the top national markets, and Plaintiffs are informed and believe, and on that basis allege, that Defendants, on an ongoing basis, utilize the market power of Cumulus in the ownership of AM and FM terrestrial stations within the United States, in combination with other anticompetitive, improper and unlawful tactics alleged in this Complaint, as improper and anticompetitive leverage to further increase and maintain the market power of Defendants in the Subject Markets.

2.    In addition to the unlawful, anticompetitive conduct of Defendants hereinabove alleged, Plaintiffs are informed and believe, and on that basis allege, that Defendants, whether collectively or in varying combinations, also: (i) since at least October of 2015, have converted money owing to certain of their national radio syndication clients who are not station owners or affiliates of, or collaborators with, station owners (**"Independent Radio Syndicators"**), by failing to pay funds clearly due to certain of such Independent Radio Syndicators or their duly designated representatives, including in particular the plaintiffs in this Action (**"Plaintiffs"**), from advertising revenues collected by Defendants, in their capacities as advertising sales representatives for Independent Radio Syndicators (**"Contracted Ad Reps"**), for the accounts of such Independent Radio Syndicators; (ii) subsequent to February 28, 2014, have converted additional amounts from Independent Radio Syndicators, including without limitation Plaintiffs, by engaging in fraudulent allocations of advertising revenues collected and/or handled by Defendants, in their capacities as Contracted Ad Reps, pursuant to which Defendants overstate the portion of the amounts from certain "bundled" bulk advertising buys (in which an advertiser pays a specified price for advertisements

to run in multiple radio programs produced by multiple content producers) that are properly allocable to programming of certain Defendants or their affiliates and collaborators, and correspondingly understate the portions of such bundled advertising revenues that are properly allocable to Plaintiffs and other Independent Radio Syndicators (**"Allocation Fraud"**), for the purpose of knowingly and intentionally converting funds properly payable to Plaintiffs and other Independent Radio Syndicators into overpayments to certain Defendants and their affiliates and/or collaborators; (iii) induced Plaintiffs to enter into various transactions on or about February 28, 2014, through false, misleading and fraudulent promises and other misrepresentations, without any bona fide intention of meeting these representations, and without complying with such representations at the time for performance; (iv) subsequent to February 28, 2014, have routinely breached binding contractual commitments concerning advertising representation services, including without limitation failure to pay revenue balances clearly due to Independent Radio Syndicators, including in particular Plaintiffs, from and after October of 2015, in addition to engaging in Allocation Fraud, deliberate underperformance and/or nonperformance of advertising sales responsibilities, and outright failure and refusal from and after October of 2015 to provide required reports on ad revenues collected for the accounts of Plaintiffs, and of the resulting distributions due with respect thereto; and (v) subsequent to February 28, 2014, have engaged in multiple other improper, wrongful and/or unlawful actions as alleged in this Complaint.

3.    In addition to violating federal and state statutes and common law, Defendants' conduct poses a significant risk to free speech under the First Amendment because it holds the prospect of eliminating or substantially reducing the number of Independent Radio Syndicators, and limiting the news and talk radio broadcasts available within the Unites States. As a consequence of that conduct,

the diversity of voices and viewpoints produced on news and talk radio within the United States is likely to decline.

## PARTIES

4.    Plaintiff TALK RADIO NETWORK ENTERPRISES, LLC ("**TRNE**") is an Oregon limited liability company with its principal place of business in the State of Oregon.

5.    Plaintiff AMERICA'S TALK NETWORK, INC. ("**ATN**") is an Oregon corporation with its principal place business in the State of Oregon.

6.    Plaintiff AMERICA'S LIFESTYLE RADIO NETWORK, INC. ("**ALRN**") is an Oregon corporation with its principal place of business in the State of Oregon.

7.    Plaintiff TALK RADIO NETWORK ENTERTAINMENT, INC ("**TRN-ENT**") is an Oregon corporation with its principal place of business in the State of Oregon.

8.    Plaintiffs are informed and believe, and on that basis allege, that defendant Cumulus is a Delaware corporation with its principal place of business located in the State of Georgia for most of the time periods at issue in this Complaint.

9.    Plaintiffs are informed and believe, and on that basis allege, that defendant WESTWOOD ONE, INC. ("**Westwood**") is a Delaware corporation with its principal place of business in the State of New York.

10.    Plaintiffs are informed and believe, and on that basis allege, that defendant COMPASS MEDIA NETWORKS, LLC ("**Compass Media**") is a Delaware limited liability company with its principal place of business in the State of New York.

11.    Plaintiffs are informed and believe, and on that basis allege, that defendant COMPASS MEDIA MARKETING, LLC ("**Compass Marketing**") is a

Delaware limited liability company with its principal place of business in the State of New York.

12.     Plaintiffs are informed and believe, and on that basis allege, that defendant WYD MEDIA MANAGEMENT, LLC ("**WYD**") is a Connecticut limited liability company with its principal place of business in the State of Connecticut.

13.     Plaintiffs are informed and believe, and on that basis allege, that defendant WYM MEDIA MANAGEMENT, LLC ("**WYM**") is a Connecticut limited liability company with its principal place of business in the State of Connecticut.

14.     Defendant LEWIS W. DICKEY, JR. ("**Dickey**") is an adult individual.   Plaintiffs are informed and believe, and on that basis allege, that Dickey is a resident of the State of Georgia.

15.     Defendant CHARLES STEINHAUER ("**Steinhauer**") is an adult individual. Plaintiffs are informed and believe, and on that basis allege, that Steinhauer is a resident of the State of New York.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this Action: (i) pursuant to 28 U.S.C. § 1331 because one or more claims arise under the laws of the United States; (ii) pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1337, because one or more claims are asserted under the Clayton Act, 15 U.S.C. §§ 12-27; (iii) pursuant to § 28 U.S.C. §1337, because one or more claims are asserted under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; and (iv) pursuant to 28 U.S.C. § 1367, because the claims arising under state law are related to the claims within the Court's original jurisdiction. Additionally, as all of the parties are citizens of different states and the amount in controversy exceeds $75,000, there exists Diversity Jurisdiction pursuant to 28 U.S.C sec. 1332.

17.    Venue is proper pursuant to 15 U.S.C. § 4, 15 U.S.C. § 5 and 15 U.S.C. § 22 because Defendants transact business in this District, and Plaintiffs are informed and believe, and on that basis allege, that Cumulus owns and/or operates multiple radio stations in the State of Oregon, including without limitation a cluster of radio stations within the Eugene, Oregon radio market.  Plaintiffs are further informed and believe, and on that basis allege, that venue is proper in this District, Medford Division because it is the District and Division in which Plaintiffs have their principal places of business, and in which the principal consequences of the anticompetitive actions and violations of the federal antitrust laws alleged in this Complaint have occurred.

## FACTUAL BACKGROUND

18.    Plaintiffs are engaged in the production and/or national syndication of non-music, non-sports, spoken word radio programming, including both news and talk radio programming (**"Spoken Word Syndication"**).  In particular, ATN, ALRN and TRN-ENT (the **"Syndication Plaintiffs"**) produce and syndicate, and/or have produced or syndicated, long form spoken word news and/or talk radio programming, and TRNE represents the Syndication Plaintiffs, and/or has represented the Syndication Plaintiffs, in affiliate relations and advertising sales.

19.    Radio syndicators or producers must share, on a confidential basis, a significant amount of confidential, proprietary information with their Contracted Ad Reps, and Plaintiffs have shared confidential and proprietary information with Westwood and Steinhauer as Contracted Ad Reps for Plaintiffs. Plaintiffs are informed and believe, and on that basis allege, that: (i) subsequent to February 28, 2014, Westwood and Steinhauer have shared confidential and proprietary information concerning Plaintiffs, obtained by Westwood and Steinhauer in the course of acting as Contracted Ad Reps for Plaintiffs, with the rest of the Defendants; and (ii) Defendants, subsequent to February 28, 2014, have utilized

Plaintiffs' confidential and proprietary information, provided to Westwood in confidence as Plaintiffs' Contracted Ad Rep, to the detriment of Plaintiffs, and to the benefit of Defendants in their efforts to expand, by improper and unlawful means, their market power within the News/Talk Radio Spoken Word Content Intellectual Property Market.

### A.    The Market For Contracted Ad Rep Services

20.    Radio programming can be produced by a station owner (whether directly or through an affiliated entity) or by Independent Radio Syndicators, such as Plaintiffs. When a station owner produces a program, whether news/talk or some other format, it can place the program on its own stations and sell advertising time on those stations to air during that program. Such vertically integrated entities are referred to as "integrated networks." Those stations may or may not also license the right to broadcast programming from Independent Radio Syndicators such as Plaintiffs.

21.    Cumulus is an example of a company that operates an integrated network. Cumulus, both directly and via a merger with Westwood, and prior mergers with, and/or acquisitions of, producers and/or syndicators of other radio programs, produces and syndicates numerous spoken word news/talk programs, as well as substantial programming in other genres (*e.g.*, sports programming), in competition with Independent Radio Syndicators. At the same time, Cumulus owns, licenses and/or otherwise controls in excess of 450 radio stations, in approximately 90 radio markets, throughout the country.

22.    Indeed, on a national basis, as a result of multiple mergers and acquisitions, Cumulus is the dominant force in ownership and/or operation of top radio stations within the largest radio markets in the United States.

23.    In contrast to an integrated network, Plaintiffs and other Independent Radio Syndicators offer programs that are produced independently of station ownership. After a program is produced, it is syndicated across a series of radio

station affiliates (which receive licenses to broadcast the programming and in turn agree to broadcast the programming in accordance with the applicable affiliation/licensing agreement), throughout a relevant geographic area. In Plaintiffs' case, programs which Plaintiffs produce, or, in the case of TRNE, represent, are syndicated nationally, in as many markets as Plaintiffs can find affiliate stations for their programs on acceptable terms.

24.    Plaintiffs and other Independent Radio Syndicators generally engage in a barter-type exchange with radio stations, pursuant to which Plaintiffs provide the stations with long form spoken word intellectual property content in exchange for Plaintiffs' right to sell commercial advertising time, most of which is broadcast during Plaintiffs' programs, but some of which might be at other specified times (**"Commercial Inventory"**). Plaintiffs and other Independent Radio Syndicators generate revenue by selling the Commercial Inventory that they obtain through that barter exchange.

25.    Plaintiffs sell the Commercial Inventory they obtain for two primary forms of advertising: (i) "direct response" advertising; and (ii) "institutional" advertising.

26.    "Direct response" advertising is advertising from companies that seek to make a direct connection with the listener. Such advertising often asks the listener to contact the advertiser directly through a website, an e-mail address, or a toll-free phone number, and typically tracks those contacts to measure the response to the advertising. Direct response advertisers often purchase Commercial Inventory within a specific program, generally for thirty seconds or one minute of air time. Plaintiffs sell direct response advertising both through Westwood and through other advertising representatives.

27.    In contrast to direct response advertising, "institutional" advertising comes from companies that seek to advertise a brand image or announcements for a product, service, or store, and generally do not seek to track the response to

specific advertisements via a website, e-mail addresses, or toll-free phone number. Solely by way of example, :institutional" advertising can include car brands such as Ford, consumer brands such as Tide or Skippy, appliance manufacturers such as Maytag, or national retail chains such as Sears (e.g., advertisements announcing "the 'X' Labor Day sale going on now at your local 'X' store" are examples of institutional advertising, whereas an advertisement of special Valentine's Day gifts that can be ordered by calling "Y" toll free number is an example of direct response advertising).

28.   Companies purchasing Commercial Inventory for "institutional" advertising generally do so through an agency, and do not buy Commercial Inventory on a program by program basis. Instead, they pay to reach a certain estimated number of listeners and/or listening time within a relevant demographic. For example, the principal demographic for national "institutional" radio advertising is persons between the ages of 25-54. "Institutional" advertisers generally buy Commercial Inventory from a bundle of programs packaged together to provide the estimated number of listeners and/or listening time that they want to reach (or buy Commercial Inventory from existing program bundles with the price they pay based upon the total listening characteristics of the applicable bundle). The cost of the purchase generally is based on a single price for the totality of the Commercial Inventory they purchased in the bundle of programs that is subject to the buy.

29.   The programs of Plaintiffs and other Independent Radio Syndicators, taken separately, generally do not reach a sufficient audience for institutional advertising. Thus, as a rule, Independent Radio Syndicators cannot sell institutional advertising directly to the institutional advertisers or their ad agencies. Instead, they must use the services of a Contracted Ad Rep, which pulls together programs from multiple syndicators to offer an advertiser, via their agency, a bundle of programs having a sufficient number of estimated listeners and/or total

listening time. This market dynamic creates a nationwide market for the services of Contracted Ad Reps – the Independent National Syndication Ad Rep Market.

30.    Contracted Ad Reps generally sell agencies Commercial Inventory from a "bundle" of programs at an agreed-upon total cost, and then distribute the net proceeds of that sale (after deduction of the agency fee of the ad agency), less the separate ad rep's commission, to the various syndicators whose programs comprised the "bundle".

31.    Having bundled Commercial Inventory for multiple programs for a price based upon the total size of the bundle of programs (i.e., for the total size and/or listening time of the audience for all of the programs or other broadcast times combined), the Contracted Ad Rep must allocate the amount paid by the advertiser, for the bundle of programs, combined, between the various programs which made up the bundle sold to the advertiser.

32.    As the price paid by the advertiser for the bundle is based upon the audience size and/or listening time for the bundle as a whole, which can be calculated by adding the aggregate measurements for those factors for all programs or broadcast times in the bundle, it is possible to determine the relative proportion that each program contributed to the total listener characteristics of the bundle, and thus to determine the proportional value each program in the bundle contributed to the total amount paid by the advertiser for the "bundle". As a result, it is possible to allocate the total payment for the "bundle" fairly between the multiple programs making up the "bundle", according to the relative portion each of the programs contributed to the total audience measurements for the "bundle" (but, as explained below, Westwood, under the implementation and oversight of Steinhauer, wrongfully fails to do so).

33.    The gross amount of an advertising sale generally is reduced by two commissions before the remaining balance is distributed to the syndicators. First, the agency that is purchasing the advertising on behalf of the advertiser takes a

commission, generally referred to as an "agency fee." Then, the Contracted Ad Rep takes a percentage commission (which is generally referred to as a "sales commission" or a "sales rep commission") out of the remaining money. Only then are the remaining proceeds distributed to the syndicators.

34.    By way of example, if an agency were to buy advertising from Westwood at a cost of $1 million for a specified audience size, Westwood would, in turn, assemble a bundle of programs which provides the requisite estimated audience size (or, alternatively, market a pre-bundled set of programs for sale with the pricing based upon the aggregate audience size and/or listening time for the pre-bundled set of programs), potentially including one or more programs syndicated by Plaintiffs. Of the total $1 million buy, if the advertiser's agency took a 15% agency fee off the top, that would leave $850,000 in advertising proceeds. Westwood should then determine the portion of the remaining $850,000 in net proceeds which is properly allocable to each program within the "bundle", deduct Westwood's agreed commission for each program, and remit the remaining balance for each such program to the program's syndicator. If Plaintiffs' programs contributed 50% of the listeners and/or listening time to the overall bundle, then Plaintiffs should receive 50% of the net proceeds (after agency), less Westwood's agreed commission amount(s), for Plaintiffs' programs.

35.    In order for this system to work, the Contracted Ad Rep has to be honest about the various aspects of each transaction, including the amount that the advertiser paid for the bundle and the share of listeners and/or listening time that any particular program provided for the bundle (and the proper proportional allocation that should be made based on the total amount paid and the prorata share of the measurement parameters contributed by the respective programs). If the Contracted Ad Rep is not forthcoming or honest about that, then the opportunity exists for substantial wrongdoing. As explained below, Defendants have taken

advantage of that opportunity for wrongdoing to enrich themselves through a series of anticompetitive, fraudulent tactics, which Plaintiffs are informed and believe, and on that basis allege, include Allocation Fraud.

36.    In particular, Westwood is not buying Commercial Inventory from the Independent Radio Syndicators, including Plaintiffs, at agreed prices and then reselling that Commercial Inventory to the advertisers for Westwood's account, as to any profit it makes or loss it sustains in the resale. To the contrary Westwood is the sales agent/representative for the sale of the syndicators' Commercial Inventory, for the syndicators' accounts, collecting what the advertiser pays for the Commercial Inventory (less the agency fees claimed by the advertiser's ad agency), and remitting that balance, less only Westwood's agreed sales rep commission, stated as a percentage of what is collected (net of agency fees) for the applicable Commercial Inventory.

37.    As such, Westwood is collecting sales proceeds for the sale of Commercial Inventory as the agent and representative of the syndicators, for the account of the syndicators, and holds and disburses such proceeds in trust for the syndicators. Accordingly, Plaintiffs are informed and believe, and on that basis allege, that Westwood and others involved in collecting, handling and disbursing the ad revenues received in trust for the accounts of their clients (including Plaintiffs), assume the fiduciary duties of a trustee with respect to collection, allocation, disbursement and truthful reporting of the actual sales proceeds of the Commercial Inventory.

38.    The radio advertising market within the United States has three identifiable submarkets: (i) national syndication advertising (the "**Syndication Market**"); (ii) national spot advertising (the "**National Spot Market**"); and (iii) the local advertising market (the "**Local Market**").

39.    The Local Market primarily consists of local businesses advertising on radio stations located in their market area, for the purpose of attracting local customers to their local place of business.

40.    The National Spot Market consists of national advertisers, through their ad representatives, contracting directly with radio stations throughout the country, in specific target markets.

41.    As such, the Syndication Market is the relevant advertising market for the sale of Commercial Inventory by Independent Radio Syndicators, such as Plaintiffs, and the Independent National Syndication Ad Rep Market is the relevant market for Contracted Ad Rep services within the Syndication Market for the particular Contracted Ad Rep services at issue in this Action.

### B.    Westwood's Monopolization of the Independent National Syndication Ad Rep Market Through Mergers, Acquisitions And Collusive Agreements

42.    Westwood is a product of multiple mergers and acquisitions, which, over time, allowed Westwood to achieve monopoly power within the Independent National Syndication Ad Rep Market.

43.    The initial chain of such anticompetitive mergers and acquisitions includes the combination of two separate companies to form the company then known as Dial Global (**"Dial Global"**).

44.    In or about June of 2008, Dial Global acquired Jones Media Group and its operating companies, Jones Media America, Jones Radio Networks, and JonesTM, from Jones International Ltd. (the **"Dial/Jones Merger"**).

45.    Through the Dial/Jones Merger, Dial Global eliminated its major competitor in the Independent National Syndication Ad Rep Market, and increased Dial Global's own market share within that market.

46.   In August 2011, Dial Global announced an agreement to merge with Westwood (the "**Dial/Westwood Merger**").   The Dial/Westwood Merger was consummated on or about October 21, 2011, and Westwood is the resulting combined company.

47.   Thereafter, on or about the end of December, 2013, Cumulus acquired Westwood.

48.   As a result of such multiple mergers and acquisitions, and other anticompetitive collaborations, partnerships, investments and other agreements, including without limitation partnerships, investments and/or collaborations with and by Cumulus and/or other Defendants subsequent to February 28, 2014, Defendants now face no meaningful competition in the Independent National Syndication Ad Rep Market.   Indeed, Defendants now have an overwhelming share of, and control over, that market, which, upon information and belief, Plaintiffs allege to be well over 90%.

49.   There are substantial barriers to entry to the Independent National Syndication Ad Rep Market, due at least in part to significant network effects in that market.

50.   In particular, any Contracted Ad Rep must have a stable of clients whose programs can be packaged together into bundles of sufficient size to attract larger institutional advertising buys.   It also must have requisite relationships with the four major agencies that buy institutional advertising, and those major agencies generally have a strong preference for dealing with Contracted Ad Reps with which they have prior experiences, rather than new market entrants.

51.   Perhaps due to the dominant position which Defendants, via Westwood, hold in the Independent National Syndication Ad Rep Market, Defendants continue to attempt to project certain false appearances of competition in that market.

52.   To cite just one particular example, Compass Marketing was formed in late 2011 or early 2012, purportedly as an independent Contracted Ad Rep. Although Compass Marketing ostensibly competes with Westwood, Plaintiffs allege, on information and belief, that Westwood owns at least 50% of Compass Marketing, and further allege, on information and belief, that Compass Media (or its affiliates) also owns a significant stake in Compass Marketing.

53.   Plaintiffs are informed and believe, and on that basis allege, that Westwood provides Compass Marketing with support systems and marketing services, and that, even though Compass Marketing is partly owned by Compass Media (or its affiliates), Compass Media uses Westwood as its Contracted Ad Rep, rather than its own affiliated Contracted Ad Rep company, thus creating the false impression to Independent Radio Syndicators of purported competition which is more illusory than real on close examination of the nature of the collaboration between the applicable entities.   Plaintiffs are further informed and believe, and on that basis allege, that Defendants are continuing, to the present time, to take various actions to reduce active competition within the National Syndication Ad Rep Market by additional collusive collaboration agreements and other arrangements.

54.   WYD produces and syndicates spoken word radio programming. WYD's founder and owner, Ron Hartenbaum, worked for Jones Media prior to the Dial/Jones Merger, and WYD maintains significant connections with Westwood, including involvement with various news/talk programs in which Westwood, and now Cumulus, apparently maintains an interest.

55.   Plaintiffs are informed and believe, and on that basis allege, that WYM is an affiliate of WYD that serves as a Contracted Ad Rep for, and offers "affiliate relations" services (*i.e.*, assisting syndicators to find radio stations to carry a show and to handle customer relations with those stations once they do) to, WYD.

### C.    Westwood's Relationship With Plaintiffs

56.    On or about February 28, 2014, Westwood and TRNE (as the ad sales representative for the Syndication Plaintiffs) entered into a written Sales Representation Agreement (the **'Rep Agreement'**), pursuant to which TRNE engaged Westwood as a sales representative for America's Morning News (**"AMN"**), and other programming which Plaintiffs produce or represent, to provide sales representation services for Plaintiffs and their designated programs throughout the United States.

57.    Cumulus and Westwood, through Dickey, the then CEO of Cumulus, induced TRNE, as the representative for Plaintiffs' programs, to enter into the Rep Agreement by making multiple representations to Plaintiffs that Cumulus, as the new owner of Westwood, would ensure that prior wrongful conduct and other improprieties by Westwood would not be repeated, and, that, in particular, Cumulus would ensure that allocations of revenues from bundled sales of Commercial Inventory would be made in a fair, proper and correct manner from that point forward, such that Plaintiffs would receive the proper level of advertising revenues they were entitled to going forward. Dickey, on behalf of Cumulus and Westwood, also represented that Cumulus would arrange for fair placements of Plaintiffs' programs on Cumulus stations, such that Plaintiffs would have fair and open access to stations constituting, as a whole, the most important news/talk stations in the country, and not have Plaintiffs' programs artificially denied access to those Cumulus stations, going forward, thus substantially increasing the value of Commercial Inventory for Plaintiffs' programming, and that Westwood would pursue aggressive sales efforts on behalf of Plaintiffs and other Independent Radio Syndicators, and that the key sales representative at Westwood who previously was in charge of the sales of Commercial Inventory for portions of Plaintiffs' programming, and demonstrated clear expertise and ability in that field, would be

the principal sales rep at Westwood in charge of such sales going forward, under the Rep Agreement, and that Cumulus would take the necessary actions to ensure that Plaintiffs would be treated fairly, properly and favorably by Cumulus and Westwood from that point forward, such that the prior histories of epic wrongdoing on the part of Westwood and its predecessor would not be repeated following the execution of the Rep Agreement on or about February 28, 2014 (collectively, the "**Dickey Representations**").

58. Plaintiffs' reasonably relied on the Dickey Representations as coming from, and having the specific assurances of, the then CEO of Cumulus, as sincere commitments based upon information only recently obtained by Cumulus given that it had just recently acquired Westwood.

59. Under the Rep Agreement, Westwood agreed to use its commercially reasonable efforts to sell advertising for radio programs which were the subject of the Rep Agreement, and TRNE agreed to pay Westwood a sales rep commission on ad revenues collected, as the sole compensation which would be due to Westwood for its Contracted Ad Rep Services.

### D.    Defendants' Anticompetitive Conduct, Breach Of The Rep Agreement, And Tortious Conduct Directed Towards Plaintiffs

60. Rather than undertaking to eliminate unlawful, wrongful and improper actions from February 28, 2014 forward, from and after February 28, 2014 to the present time, Defendants have continued to engage in unlawful, wrongful and improper actions, and used their power in the Independent National Syndication Ad Rep Market, as well as other unlawful, improper and/or tortious actions, to enrich themselves at the expense of Plaintiffs and other Independent Radio Syndicators.

61. As described above, after Westwood sells Commercial Inventory to advertisers on a bundled basis, it should allocate the resulting revenues in

proportion to the estimated audience parameters generated by each program in an advertising bundle.

62.     Defendants have not been transparent in their allocations.    They do not tell Plaintiffs or, to Plaintiffs' knowledge, other Independent Radio Syndicators whose programs are included in an advertising bundle, what the relative share of listeners and/or listening time generated by any particular program in the bundle is. Nor do they tell Plaintiffs or other Independent Radio Syndicators whose programs are included in particular bundles what the advertiser actually paid, in total, for the bundle.    Plaintiffs are informed and believe, and on that basis allege, that Defendants instead only state the amount purportedly paid for Commercial Inventory of the Independent Radio Syndicators, separately, without specifying that the information instead is of the amount unilaterally allocated by Defendants, rather than the amount paid, because Defendants conceal this information from Plaintiffs and other Independent Radio Syndicators (i.e., Defendants present the pricing information to Plaintiffs and other Independent Radio Syndicators in a manner which states, or is intended to give the impression, that this is the proportional price paid for their Commercial Inventory, rather than the amount which Defendants unilaterally chose to allocate to their Commercial Inventory from the actual price received).    Plaintiffs are informed and believe, and on that basis allege, that this improper procedure gives Defendants the opportunity to manipulate, unlawfully, wrongfully and improperly, ultimate payments made to the participants in a particular bundle, and that one or more of the Defendants, including without limitation Steinhauer, Westwood and Cumulus, take full advantage of that opportunity to their personal benefit, and to the extreme detriment of Plaintiffs.

63.     In particular, Plaintiffs are informed believe, and on that basis allege, that Defendants have taken advantage of their opportunity to manipulate the allocation process by enriching themselves.    In particular, as Westwood has

increasingly pushed into the News/Talk Radio Spoken Word Content Intellectual Property Market, Defendants have included in advertising bundles programs that Defendants produce and/or syndicate. Plaintiffs are informed and believe, and on that basis allege, that Defendants also increasingly steer outsized shares of the net advertising revenue from "institutional" advertisers to Defendants, at the expense of Plaintiffs and other Independent Radio Syndicators, by over allocating the amounts actually paid for Defendants' Commercial Inventory, and under allocating the amounts actually paid for the Commercial Inventory of Plaintiffs and other Independent Radio Syndicators.

64.    Plaintiffs are informed and believe, and on that basis allege, that: (i) Westwood is able to steer outsized shares of net advertising revenue to itself and other Defendants because it fails to state the amounts that advertisers have paid for the audience characteristics of each program in a particular bundle; (ii) Westwood then either retains the excess for itself or it credits it to programs that it or other Defendants own, produce, and/or syndicate and that were included in the same advertising bundle; and (iii) Westwood has engaged in such actions on an ongoing basis after February 28, 2014.

65.    In engaging in such actions, as hereinabove alleged, Westwood also effectively misrepresents to Plaintiffs the amounts that the advertiser is paying for Plaintiffs' Commercial Inventory.

66.    Plaintiffs are informed believe, and on that basis allege, that Defendants are able to do this because they refuse to disclose to Plaintiffs or other producers or syndicators the specifics of programs in any particular bundle, and, more specifically, the percentage of the audience parameters represented by each program, the separate allocations to each program, or the total amount paid.

67.    Plaintiffs are informed believe, and on that basis allege, that, by misrepresenting the amounts paid for the Commercial Inventory of the Independent Radio Syndicators, including Plaintiffs, Defendants, on an ongoing

basis after February 28, 2014, fraudulently reduce the disclosed allocation of ad revenue that Westwood owes to Plaintiffs and other Independent Radio Syndicators for programs that are owned, produced, or syndicated by anyone but Westwood and its affiliates (including without limitation Cumulus), and Westwood then claims an outsized share of the total ad revenue from a bundle for itself or its affiliates (including without limitation Cumulus).

68.     Plaintiffs are informed believe, and on that basis allege, that, since February 28, 2014, Westwood, in conjunction with other Defendants, also has failed to perform its ad rep services reasonably, caused the sales representative Plaintiffs were promised would lead the sales efforts for Plaintiffs to fail to perform such duties, at all, after February 28, 2014, and transferred his services, at least for the record, to an affiliate of one of the other Defendants not providing services to Plaintiffs, in order to fail to provide any performance at all to Plaintiffs initially following the commencement of the term of the Rep Agreement, and then to under perform in sales activity under the Rep Agreement.   In addition, commencing in October of 2015, and continuing to the present, Westwood has failed to pay over even those amounts actually due to Plaintiffs, based upon the sale of Plaintiffs' Commercial Inventory which Defendants actually acknowledged (after the deductions for the extensive amounts of sales revenues actually converted by Defendants through Allocation Fraud), and failed to issue the revenue and disbursement reports due to Plaintiffs under the Rep Agreement.

69.     Plaintiffs are informed and believe, and on that basis allege, that Steinhauer is the key overseer, on behalf of Defendants, in the formulation and implementation of Defendants' unlawful scheme to convert millions of dollars in ad revenues, collected by Westwood in trust for Plaintiffs and other Independent Radio Syndicators, to the benefit of Defendants, through massive use and application of Allocation Fraud.

70.    Plaintiffs are informed and believe, and on that basis allege, that Defendants, subsequent to February 28, 2014, continue to utilize their market power within the Independent National Syndication Ad Rep Market to further procure confidential and proprietary information concerning programs of Independent Radio Syndicators, including Plaintiffs, as well as host or news anchor relationships, and advertising and affiliate relationships, for such programs, and then act in ways calculated to inhibit the ability of the Independent Radio Syndicators to continue such programming, in order to then appropriate such programs, and/or the programming hosts, anchors, and/or methodologies, to themselves for the purpose of expanding Defendants' programming and/or market share in the News/Talk Radio Spoken Word Content Intellectual Property Market.

71.    Plaintiffs are now informed and believe, and on that basis allege, that the Dickey Representations inducing Plaintiffs to enter into (directly or indirectly) the Rep Agreement, and the following nonperformance and/or underperformance of Defendants thereunder, were undertaken by Defendants as part of a conspiracy by and between Defendants, and were, in part, designed to prevent Plaintiffs from expanding on the news programming of AMN, and other potential news programming of Plaintiffs, in order to facilitate the launch of separate news programming by Westwood, and to minimize the capacity of Plaintiffs to operate against new Westwood news programming, which Defendants intended to, and did, announce and then launch, in 2014, after the execution of the Rep Agreement. Such new programming was announced by Cumulus and Westwood towards the end of July, 2014, and Plaintiffs are informed and believe, and on that basis allege, that it involved acquisition by Westwood of news content of CNN, after Westwood had a negative effect on the syndication and distribution of CNN's radio news content, and further involved the substitution of Westwood's own branded news content (now consisting of CNN news content with Westwood/Cumulus branding and related modifications) for ABC news content previously distributed by

Westwood, such that Westwood's prior representation of CNN and ABC radio news led to the ultimate loss of that separate programming previously distributed under their own independent branding (CNN and ABC). Plaintiffs are informed and believe, and on that basis allege, that Westwood's actions towards Plaintiffs and AMN after February 28, 2014 were designed, at least in part, to limit the ability of Plaintiffs to expand Plaintiffs' news programming in competition with Westwood.

72.    Defendants would not be able to engage in the conduct alleged above but for their monopoly power in the Independent National Syndication Ad Rep Market. If Defendants did not have a monopoly, but rather faced meaningful competition in the Independent National Syndication Ad Rep Market, Defendants would face competitive pressure to be transparent in handling bundles of programs and the related Commercial Inventory for such programs. However, Defendants face no such competitive pressure and therefore have no perceived need to be transparent in their dealings with Plaintiffs or any other Independent Radio Syndicators.

73.    Plaintiffs are informed believe, and on that basis allege, that, after February 28, 2014, in addition to engaging in Allocation Fraud by manipulating advertising revenue allocations, Defendants use their monopoly power in the Independent National Syndication Ad Rep Market to advantage their own programs at the expense of programs of Independent Radio Syndicators, including without limitation Plaintiffs. In this regard, Plaintiffs are informed and believe, and on that basis allege, that Defendants have utilized Westwood's position as a Contracted Ad Rep for Plaintiffs and other Independent Radio Syndicators to weaken the independent programs of Plaintiffs and other Independent Radio Syndicators, to the benefit, in various respects, of the efforts of Defendants to expand upon their market power within the News/Talk Radio Spoken Word Content Intellectual Property Market, as hereinabove alleged. In particular,

Plaintiffs are further informed and believe, and on that basis allege, that, in addition to all other actions of the Defendants subsequent to February 28, 2014 alleged in this Complaint: (i) Westwood includes Defendants' programs in more bundles, and/or more profitable bundles, of programs, at the expense of programs produced and/or syndicated by Plaintiffs and other Independent Radio Syndicators; (ii) Westwood underperforms with respect to sales of AMN and other programs of Plaintiffs and other Independent Radio Syndicators; and (iii) Defendants wrongfully interfere with host and other relationships of Plaintiffs and other Independent Radio Syndicators.

74.    Plaintiffs are informed believe, and on that basis allege, that Defendants could not engage in such conduct but for their monopoly power in the Independent National Syndication Ad Rep Market. Plaintiffs are informed and believe, and on that basis allege, that, in particular, if Westwood faced any meaningful constraint on its market power in the Independent National Syndication Ad Rep Market, it would be forced to include more programs from other producers in its advertising bundles, even at the expense of Defendants' own programs, and, in addition, Defendants would be constrained, by competitive market forces, from providing services to particular news and/or talk programs of Plaintiffs and other Independent Radio Syndicators for temporary periods (whether or not Defendants elected to introduce underperformance and/or non performance into such temporary service), to weaken such programs due to such temporary performance periods, followed by discontinuing services to those programs, followed by launches, and/or expansions, of similar programs of Defendants within the News/Talk Radio Spoken Word Content Intellectual Property Market, and that Westwood has repeated that pattern of conduct with respect to Plaintiffs and the Rep Agreement.

75.    Plaintiffs are informed believe, and on that basis allege, that Defendants' financial results, as reported by Defendants, since the execution of the

Rep Agreement, evidence the effect of Defendants' conversion of sales revenue, collected by Westwood in trust for Plaintiffs and other Independent Radio Syndicators, as hereinabove alleged, and, in particular, the use of Allocation Fraud.

76.   Pursuant to their rights under the Rep Agreement, Plaintiffs have sought access to Westwood's books and records relating to the sale of advertising on Plaintiffs' programs, but Defendants have failed to permit Plaintiffs to conduct any such audit.   Plaintiffs have therefore been unable to determine the exact amount by which they have been underpaid.

77.   Westwood's conduct subsequent to February 28, 2014, all of which is a product of its power in the Independent National Syndication Ad Rep Market, has a significant effect on consumers and consumer welfare, in several respects.

78.   Independent Radio Syndicators, who are the consumers of Westwood's services as a Contracted Ad Rep, must pay what amounts to a higher price to Westwood for its services, because the Independent Radio Syndicators' programs receive an artificially smaller share of the total ad revenue than programs that Westwood or its affiliates control.   The net effect of that conduct is the same as if Defendants were to use their market power to raise their commission rates – Independent Radio Syndicators receive less than they otherwise would because Cumulus and Westwood One have market power.   Indeed, in essence, Westwood fraudulently takes more than its agreed commission rates from Plaintiffs and other Independent Radio Syndicators by fraudulently deflating sales revenues actually earned by programs of Plaintiffs and other Independent Radio Syndicators and fraudulently increasing the revenues allocated to programs of Defendants.

79.   Because Independent Radio Syndicators receive less revenue from Westwood, they produce and syndicate fewer programs.   Relatedly, as Defendants consolidate programs to their own account or the account of their affiliates, they become increasingly able to exclude programs of Independent Radio Syndicators from Westwood's bundles entirely.   As a result, those Independent Radio

Syndicators are precluded and/or inhibited from selling Commercial Inventory to "institutional" advertisers, and many therefore are forced to stop producing or syndicating programs. As a result of all of this, there are fewer programs produced in total, and/or fewer programs able to provide competition to Defendants' programs within the News/Talk Radio Spoken Word Content Intellectual Property Market, and the listening public has fewer options from which to choose; and, as well, Defendants further expanded their new programming, and their market power, in the News/Talk Radio Spoken Word Content Intellectual Property Market by virtue of such unlawful, wrongful and improper tactics.

80.    Plaintiffs are informed and believe, and on that basis allege, that: (i) Steinhauer is a, if not the, focal point in implementing and overseeing the Allocation Fraud schemes of Defendants in converting the ad revenues of Independent Radio Syndicators, including Plaintiffs, to prop up the financial fortunes of Cumulus and Westwood by engaging in Allocation Fraud, as hereinabove alleged, and in hiding such actions from the Independent Radio Syndicators, including Plaintiffs; (ii) contrary to the express representations of Dickey, Cumulus has not undertaken any meaningful actions to stop such Allocation Fraud, and other unlawful, wrongful and improper actions of Westwood, but, instead, Cumulus permits such actions to continue and/or directly encourages, promotes and/or requires such actions, in order to reap the financial benefits of converting substantial amounts of money from Plaintiffs and other Independent Radio Syndicators to Defendants; (iii) Defendants are further converting funds of Plaintiffs from and after October of 2015, by knowingly and intentionally refusing to pay over to Plaintiffs even those funds clearly remaining due to Plaintiffs from funds collected by Defendants, in trust, for Plaintiffs' account, from sales revenues generated from sales by Westwood of Plaintiffs' Commercial Inventory, even after the effects of the initial conversions of Plaintiffs' funds held in trust by Defendants resulting from Defendants' ongoing

Allocation Fraud; and (iv) from and after October of 2015, Defendants have failed and refused even to issue to Plaintiffs the ad sale revenue receipts and disbursement reports expressly required under the Rep Agreement. Plaintiffs have demanded that Defendants perform their obligations to deliver such reports and pay over the amounts due, but Defendants have failed and refused, from and after October of 2015, and continue to fail and refuse, to do so.

81.    Defendants have, on multiple occasions, interacted improperly with various hosts with whom Plaintiffs have ongoing contractual relationships, resulting in damages to Plaintiffs' relationships with such hosts and loss of certain of Plaintiffs' programs, resulting in further damages to Plaintiffs in addition to the substantial revenue losses sustained by Plaintiffs by virtue of the other unlawful, wrongful and improper actions of Defendants, as hereinabove alleged.

## FIRST CAUSE OF ACTION
**(Monopolization of the Independent National Syndication Ad Rep Market)**
(Against Cumulus and Westwood One)

82.    Plaintiffs incorporate by reference the allegations in paragraphs 1 - 81, above.

83.    The Independent National Syndication Ad Rep Market is a discreet, nationwide product market for the services of Contracted Ad Reps within the national Syndication Market.

84.    Plaintiffs are informed and believe, and on that basis allege, that: Cumulus and Westwood have monopoly power in the Independent National Syndication Ad Rep Market, within the national Syndication Market, by virtue of their approximately 90% market share in that market.

85.    Plaintiffs are informed and believe, and on that basis allege, that: Cumulus and Westwood willfully acquired, maintained and exercised their monopoly in the Independent National Syndication Ad Rep Market within the

national Syndication Market, by their acts and practices described above, including their active involvement in, and/or their deliberate failure to curtail, the unlawful Allocation Fraud scheme which Westwood and Steinhauer continued to pursue, if not increase, following the execution of the Rep Agreement, all in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and by continuing, subsequent to February 28, 2014, their actions and course of conduct in acquiring, contracting with, partnering with and/or otherwise neutralizing businesses seen as presenting actual or potential competition to the monopoly power and dominance of Defendants in the Independent National Syndication Ad Rep Market. In this regard, Plaintiffs are informed and believe, and on that basis allege, that WYD and WYM are operated in collusion with Cumulus and Westwood, in order to provide the appearance of other parties engaged in the Subject Markets, while acting in collusion with Westwood and Cumulus and that on or about July 7, 2014, WYD formed a subsidiary limited liability advertising sales company, WYD Media Ad Sales, LLC (**"WYD Ad Sales"**) to create the appearance of competition, and for the further purpose of having the senior sales rep expressly designated to oversee and work on sales for Plaintiffs' programs purportedly leave Westwood to serve as president of WYD Ad Sales. Thereafter, after Westwood learned of the identity of a Contracted Sales Rep which Plaintiffs intended to use to attempt to address the virtually nonexistent level of advertising sales undertaken by Westwood with respect to Plaintiffs' Commercial Inventory, Defendants arranged for WYD Ad Sales to enter into some form of "partnership" with that company, and then inhibited and prevented that company from performing any viable level of ad sales activity for Plaintiffs.

86.     The goal, purpose, and/or effect of Defendants' scheme was to reduce payments made to Independent Radio Syndicators, such as Plaintiffs, by steering money to Westwood, Cumulus and/or their affiliates via unlawful Allocation

Fraud, direct conversion of amounts clearly due to Plaintiffs even after application of the unlawful Allocation Fraud scheme, and other improper practices.

87.     Plaintiffs have been injured in their business and property by reason of Defendants' unlawful conduct, as hereinabove alleged. In particular, as a result of Defendants' violations, Westwood's payments to Plaintiffs and to other Independent Radio Syndicators have been lower than they should have been, and/or otherwise would have been.

88.     Defendants' conduct affected Plaintiffs and most, if not all, other consumers of Westwood's services, such as other Independent Radio Syndicators. Defendants' conduct also eliminates programs from the market, and therefore diminishes consumer choice and damages consumer welfare.

89.     Such unlawful conduct on the part of Westwood and Cumulus threatens continuing loss and damage to Plaintiffs if not enjoined by this Court, and unless Defendants divest, or are divested of, all assets giving rise to monopoly powers to Defendants, or any of them, in the Subject Markets, or either of them, and divestment of all operations by Defendants across multiple markets, including without limitation the Subject Market and/or any other market for radio ownership, Plaintiffs have demanded, and by issuance of this Complaint do hereby further demand, that Defendants promptly agree to such divestiture, and immediately confirm their agreement to do so.

## SECOND CAUSE OF ACTION
### (Attempted Monopolization of the Independent National Syndication Ad Rep Market)
### (Against Cumulus and Westwood)

90.     Plaintiffs incorporate by reference the allegations in Paragraphs 1 - 89, above.

91.    If Cumulus and Westwood do not already have monopoly power in the Independent National Syndication Ad Rep Market, then they have a dangerous probability of success in achieving monopoly power in the Independent National Syndication Ad Rep Market.

92.    With the specific intent to achieve a monopoly, Westwood and Cumulus, by their acts and practices described herein, including their conduct with respect to Allocation Fraud concerning advertising revenues due to Independent Radio Syndicators, such as Plaintiffs, and Cumulus, by acquisition of Westwood and subsequent acquiescence and participation in Westwood's unlawful and improper actions, and exercise of its own monopoly and/or dominant market power within the market for radio station ownership within the United States of America as leverage to assist in the expansion of the market power of Westwood and Cumulus in the Independent National Syndication Ad Rep Market, in connection with the actions of Westwood, have attempted to monopolize the Subject Markets, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

93.    The goal, purpose, and/or effect of Defendants' scheme was to reduce payments made to Independent Radio Syndicators such as Plaintiffs by diverting money due and/or otherwise available to Plaintiffs and other Independent Radio Syndicators to Defendants and/or their affiliates.

94.    Plaintiffs have been injured in their business and property by reason of Defendants' unlawful conduct.  In particular, as a result of Westwood's violations, Westwood's payments to Plaintiffs and to other Independent Radio Syndicators have been lower than they otherwise would have been, and, in particular, lower than they should be.

95.    Such unlawful conduct threatens continuing loss and damage to Plaintiffs and to competition in the market more generally if not enjoined by this Court.

**THIRD CAUSE OF ACTION**
**(Conspiracy to Monopolize)**
(Against All Defendants)

96.    Plaintiffs incorporate by reference the allegations in paragraphs 1 - 81, above.

97.    Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the Independent National Syndication Ad Rep Market and the monopolization of the News/Talk Radio Spoken Word Content Intellectual Property Market.

98.    At the time of such actions, the Defendants were actual and/or potential competitors in the Independent National Syndication Ad Rep Market.

99.    Defendants conspired with the specific intent, knowledge, and purpose that their anticompetitive agreements would result in Cumulus and Westwood willfully maintaining and/or securing or attempting to secure a monopoly in the Independent National Syndication Ad Rep Market and/or the News/Talk Radio Spoken Word Content Intellectual Property Market.

100.    Compass Media, Compass Marketing, WYD, WYM, Dickey and Steinhaur knew that the natural and probable consequences of their actions and agreements as herein alleged would be the monopolization of the Subject Markets by Cumulus and Westwood.

101.    Defendants have committed overt acts in furtherance of their conspiracy. Thus, Defendants have entered into, complied with, and implemented agreements relating to Allocation Fraud, monopolization, and other improper actions in the Subject Markets, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

102.    But for the Defendants' conspiracy to monopolize, Defendants or their competitors would have honestly allocated revenues generated by programs within

advertising bundles, and otherwise engaged in proper sales activities for Plaintiffs and other Independent Radio Syndicators, without improper actions designed to convert Plaintiffs' funds held in trust by Westwood, and without interfering with Plaintiffs' hosts and damaging the viability of Plaintiffs' programming, and Plaintiffs and other Independent Radio Syndicators would have been paid more as a result.

103.    Plaintiffs have been injured in their business and property by reason of Defendants' unlawful conduct.  During the relevant period after February 28, 2014, Defendants sold significant numbers of advertisement bundles including Plaintiffs' programs, and, as a result of the illegal conduct alleged herein, Plaintiffs were not paid a market rate for Commercial Inventory on the programs that they produce and represent.

104.    This unlawful conduct hereinabove alleged threatens continuing loss and damage to Plaintiffs if not enjoined by this Court.

## FOURTH CAUSE OF ACTION
### (Unlawful Agreements in Restraint of Trade)
(Against All Defendants)

105.    Plaintiffs incorporate by reference the allegations in paragraphs 1 - 81 above.

106.    Westwood, Cumulus, Compass Media, Compass Marketing, WYD and WYM were, ostensibly, actual and/or potential competitors in the Independent National Syndication Ad Rep Market.

107.    Those Defendants, Dickey and Steinhauer engaged in continuing illegal contracts, combinations, and conspiracies in restraint of trade, the purpose and effect of which was to create the false appearance of competition in the Independent National Syndication Ad Rep Market, allocate the Independent National Syndication Ad Rep Market between them, and fix and/or misallocate

amounts that Contracted Ad Reps would have to pay Independent Radio Syndicators such as Plaintiffs.

108. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of controlling and/or dividing the Independent National Syndication Ad Rep Market and reaping unlawful, improper and excessive revenues from it by unlawful actions and a pattern of unlawful, wrongful and improper dealing.

109. By entering into such unlawful agreements, Defendants have unlawfully conspired in restraint of trade and violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("**Section 1**"). Defendants' agreements constitute a horizontal market allocation and price-fixing agreement between actual or potential competitors, which is a *per se* violation of Section 1.

110. In the alternative, Defendants' agreements are an unreasonable restraint of trade in violation of Section 1 under either a "quick look" or a "rule of reason" analysis. There are no precompetitive justifications for the agreements between Westwood and/or Cumulus and the other Defendants. On the other hand, there are significant anticompetitive effects as a result of those agreements.

111. But for such unlawful agreements, the Defendants would have competed in the Independent National Syndication Ad Rep Market, and, as a result, Defendants would have paid more to Independent Radio Syndicators such as Plaintiffs.

112. Plaintiffs have been injured in their business and property by reason of the unlawful contracts, combinations, and/or conspiracies. During the relevant period, Defendants sold substantial numbers of advertisement bundles including Plaintiffs' programs, and, as a result of the illegal conduct alleged herein, Plaintiffs were not paid a market rate for the Commercial Inventory on the programs that they produce and/or syndicate and/or represent.

113.   Such unlawful conduct threatens continuing loss and damage to Plaintiffs if not enjoined by the Court.

## FIFTH CAUSE OF ACTION
### (Violation of Clayton Act § 7 – Mergers)
(Against Cumulus and Westwood)

114.   Plaintiffs incorporate by reference the allegations in paragraphs 1 – 113 above of this Complaint.

115.   Cumulus and Westwood, directly or indirectly, have acquired assets of their competitors, and then combined those assets themselves, the effect of which was likely to reduce competition, or to create a monopoly, in the Subject Markets, and have continued after February 28, 2014 to the present time to use such monopoly powers in a manner designed to maintain, extend and further their monopoly and/or market power and/or dominance in the Subject Markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

116.   As a result of the acquisitions and the anticompetitive conduct from and after February 28, 2014 enabled thereby, as set forth herein, Plaintiffs have been injured in their business or property in the form of receiving lower advertising revenues than they would have received, and sustaining additional damages which they would not have sustained, but for the wrongful, unlawful and improper actions hereinabove alleged.

## SIXTH CAUSE OF ACTION
### (Violation of Clayton Act § 7)
(Against all Defendants)

117.   Plaintiffs incorporate by reference the allegations in paragraphs 1 – 116 above of this Complaint.

118.   As a result of the actions of the Defendants, as hereinabove alleged, Plaintiffs have been injured in their business or property in the form of receiving lower advertising revenues than they would have received but for such actions.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract – Rep Agreement)
(Against Westwood)

119.   Plaintiffs incorporate by reference paragraphs 1 – 81 of this Complaint.

120.   Westwood has breached or otherwise violated multiple obligations that it owes to Plaintiffs under the Rep Agreement.   Westwood's contractual violations include underpayment of, and failure to pay, advertising revenues collected by Westwood for Plaintiffs' Commercial Inventory, failure to include Plaintiffs' programs in appropriate advertising bundles, the inclusion of Plaintiffs' programs only in less favorable bundles, failure to pay other amounts clearly due for advertising revenues of Plaintiffs collected by Westwood, failure to account to Plaintiffs for ad revenues collected and disbursements due, failure to issue required reports relating thereto, failure to use commercially reasonable efforts in performing Westwood's duties to Plaintiffs, and refusal to permit Plaintiffs' required access to Westwood's books and accounting records.

121.   Plaintiffs have been damaged as a result of Westwood's conduct and breaches of the Rep Agreement, as hereinabove alleged.

122.   The accounts of Westwood's sales of bundles are so complicated that an ordinary fixed sum is likely impracticable.

## EIGHTH CAUSE OF ACTION
### (Conversion – Against Cumulus, Westwood and Steinhauer)

123.   Plaintiffs incorporate by reference the allegations in paragraphs 1 – 118, above, of this Compliant.

124.   In collecting revenues for Plaintiffs' account and failing and refuisng to pay such revenues over to Plaintiffs, or to account to Plaintiffs for such revenues, Westwood, Cumulus and Steinhauer have converted funds of Plaintiffs to their personal uses, and conspired between themselves to do so.

125.   Plaintiffs have been damaged by such wrongful and unlawful conduct in amounts to be established by evidence in this Action.

126.   The wrongful actions of the responsible Defendants were willful, wanton, oppressive and egregious, and justify an award of exemplary and punitive damages against the responsible Defendants, and each of them, in such amounts as to each of the responsible Defendants, separately, as are necessary to accomplish the purpose and objectives of such awards as to each of the responsible Defendants, separately.

127.   The responsible Defendants each have substantial net worths, and substantial annual incomes, such that commensurate high exemplary and punitive damage awards are necessary, as to each of them, separately, to accomplish the purposes of such awards.

## NINTH CAUSE OF ACTION
### (Breach of Fiduciary Duty – Against Westwood)

128.   Plaintiffs incorporate by reference the allegations in paragraphs 123 - 127 of this Complaint.

129. Plaintiffs and Westwood are parties to a fiduciary relationship because, when Westwood acts as a Contracted Ad Rep on Plaintiffs' behalf, it is acting as Plaintiffs' agent and is collecting funds, for Plaintiffs' account, from its sale of Plaintiffs' Commercial Inventory for Plaintiffs' account, in trust for Plaintiffs, and, thus, has fiduciary duties to Plaintiffs.

130. Westwood breached its fiduciary relationship with, and its fiduciary duties to, Plaintiffs by engaging in the actions hereinabove alleged, to Plaintiffs' detriment and/or to the advantage of Defendants, all in violation of Westwood's fiduciary obligations to Plaintiffs.

131. Plaintiffs have been damaged as a result of Westwood's actions as hereinabove alleged.

132. Plaintiffs are entitled to recover exemplary and punitive damages from each of the responsible Defendants, as hereinabove alleged.

## TENTH CAUSE OF ACTION
### (Tortious Interference with Contractual Relations and Conspiracy to Tortiously Interfere With Contractual Relations)
#### (Against All Defendants)

133. Plaintiffs incorporate by reference the allegations in paragraphs 1 - 116 of this Complaint.

134. From the date of creation of the Rep Agreement to the present time, Plaintiffs have or have had contracts with various hosts of Plaintiffs.

135. Defendants were aware of the Plaintiffs' relationships with their hosts. Defendants formed and/or participated in a conspiracy designed to rupture one or more of those relationships.

136. One or more of the Defendants has taken an intentional, overt act to induce one or more hosts to breach their contracts with Plaintiffs or otherwise to disrupt Plaintiffs' contractual relationships with those hosts.

137.   There has been an actual breach or disruption of Plaintiffs' contracts with hosts, and/or interference with Plaintiffs' contracts with hosts, as a result of such conduct, as hereinabove alleged.

138.   Plaintiffs have been damaged as a result of such conduct.

139.   Plaintiffs are entitled to recover exemplary and punitive damages from each of the responsible Defendants, as hereinabove alleged.

## ELEVENTH CAUSE OF ACTION
### (Fraud Against Dickey, Cumulus and Westwood)

140.   Plaintiffs incorporate by reference the allegations of paragraphs 1 through 138, above, of this Complaint.

141.   The misrepresentations by Dickey, and by Cumulus and Westwood, acting through Dickey as the then CEO of Cumulus, as hereinabove alleged, were false, knowing, intentional and fraudulent.

142.   Plaintiffs reasonably relied on said representations, as Dickey cited the recent acquisition of Westwood by Cumulus and claimed to desire to start a new leaf for Westwood in its dealings with Independent Radio Syndicators, including Plaintiffs, and in correcting, eliminating and rectifying the past unlawful actions of Westwood.

143.   Such representations were, however, knowingly and intentionally false, misleading and fraudulent.

144.   The true facts were that Westwood and Cumulus, under the leadership of Dickey, had no intentions of correcting the past wrongful conduct of Westwood, and, to the contrary, intended to continue such wrongful conduct, and, indeed, to expand upon it, in order to reap financial benefits for Defendants, going forward, from such wrongful conduct.

145. The falsity of such fraudulent misrepresentations was not known by Plaintiffs at the time that TRNE entered into the Rep Agreement for the benefit of all Plaintiffs.

146. Plaintiffs have been damaged as a direct and proximate result of the fraud and misrepresentations of Dickey, Cumulus and Westwood, as hereinabove alleged.

147. Plaintiffs are entitled to recover exemplary and punitive damages from each of the responsible Defendants, as hereinabove alleged.

## TWELFTH CAUSE OF ACTION
### (Violation of Cartwright Act)
### (Against All Defendants)

148. Plaintiffs incorporate by reference the allegations in paragraphs 1 - 118 above of this Complaint.

149. Defendants have agreed and/or conspired to combine their resources for the purpose of restraining commerce and preventing competition in the Subject Markets.

150. Defendants have taken illegal actions in furtherance of their unlawful, wrongful, improper and collusive agreements.

151. Defendants' conduct violates the Cartwright Act, Cal Bus. and Prof. Code § 16700 *et seq.*

152. Plaintiffs have suffered economic damage as a proximate result of those acts.

## THIRTEENTH CAUSE OF ACTION
### (Violation of Cal. Bus. and Prof. Code § 17200)
### (Against All Defendants)

153. Plaintiffs incorporate by reference the allegations in paragraphs 1 - 151 above of this Complaint.

154.   Each of the Defendants has engaged in unfair competition by virtue of one or more unlawful, wrongful and/or improper acts, as hereunder alleged, in violation of Section 17200 of the California Business and Professions Code.

155.   Plaintiffs have been damaged as a result of Defendants' conduct as hereinabove alleged.

## FOURTEENTH CAUSE OF ACTION
### (Unjust Enrichment) - (Oregon Law)
(Against Cumulus and Westwood)

156.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 125 above of this Complaint.

157.   Plaintiffs conferred a benefit upon Westwood and Cumulus by permitting Westwood to sell Commercial Inventory for Plaintiffs' programs, and by paying Westwood a commission for that service.

158.   Westwood and Cumulus were aware that they received those benefits.

159.   Under the circumstances, it would be unjust to allow Westwood and Cumulus to receive those benefits without paying Plaintiffs for them, in full.

   a.   By engaging in the conduct described above, Westwood and Cumulus have been unjustly enriched at the expense of Plaintiffs, and Cumulus and Westwood are required, in equity and good conscience, to disgorge and pay their ill-gotten gains to Plaintiffs.

## FIFTEENTH CAUSE OF ACTION
### (Breach of the Implied Covenantt of Good Faith and Fair Dealing)
(Against Westwood)

160.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 160, inclusive of this Complaint.

161.    There is an implied covenant of good faith and fair dealing inherent in every contract.

162.    There is also an implied covenant of good faith and fair dealing inherent in the status of acting as an agent, fiduciary, trustee, custodian and/or bailee for Plaintiffs with respect to Plaintiffs' revenues from the sale by Westwood of Plaintiffs' Commercial Inventory for Plaintiffs' account.

163.    By engaging in the conduct described above, Westwood has breached the implied covenant of good faith and fair dealing owed to Plaintiffs by Westwood under the Rep Agreement.

164.    Plaintiffs have been damaged as a result of Westwood's violations of the implied covenant of good faith and fair dealing, in an amount to be determined at the trial of this Action.

165.    Plaintiffs are entitled to recover exemplary and punitive damages for Westwood's violation of the implied covenant of good faith and fair dealing with respect to Westwood's fiduciary obligations to Plaintiff as agent, trustee, custodian and bailee of the proceeds from the sale of Plaintiffs' Commercial Inventory sold by Westwood, as Plaintiffs' agent, for the account of Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated herein, Plaintiffs pray for judgment against Defendants, and each of them, as their responsibilities are determined in this Action, and for further relief, as follows:

A.    A judgment for three times all damages actually sustained by Plaintiffs, as determined by a jury;

B.   A declaration that Defendants have violated the antitrust laws, committed the torts described above, and/or breached their contracts with, and fiduciary duties and/or other obligations to, Plaintiffs;

C.   Permanent injunctive relief, which enjoins Defendants from entering into any further illegal, wrongful, improper or collusive agreements, and requires them to take affirmative steps to dissipate the anticompetitive effects of their prior violations, including without limitation their continuing unlawful, wrongful and improper use of monopoly power for leverage and other wrongful purposes, including but not limited to divestment of all assets according such monopoly powers to Defendants, and compelling divestitures of all operations by Defendants across multiple markets, such that each of the Defendants is restricted to operating solely in the market for station ownership, solely in the Independent National Syndication Ad Rep Market, or solely in the News/Talk Radio Spoken Word Content Intellectual Property Market, such as to preclude the improper continuing use by Defendants of market power in one market as improper leverage and/or instrumentalities to increase market power in other markets, as well as a requirement that Westwood represent Plaintiffs properly, and to the best of its ability, as a Contracted Ad Rep, until all such divestments are complete and/or competitive balance is restored to the Independent National Syndication Ad Rep Market and Plaintiffs are able to find truly proper, adequate and independent Contracted Ad Rep services from independent and capable alternate providers within the Independent National Syndication Ad Rep Market;

D.   An accounting;

E.   A judgment awarding additional damages to Plaintiffs from each of the responsible Defendants, separately, as exemplary and punitive damages, in such amounts, in addition to all other damages awarded to Plaintiffs, as are necessary to punish the responsible Defendants adequately and to serve as an adequate and effective deterrent to others;

F.     For interest on all amounts due and unpaid to Plaintiffs from Westwood for the sale of Plaintiffs' Commercial Inventory by Westwood, at the maximum rate allowed by law, from the dates such amounts were first due to the date of actual payment of each such amount to Plaintiffs;

G.     The costs of this suit, including an award of attorneys' fees; and

H.     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial as to all issues so triable.


**DATED** this 11th day of April, 2016.


CAUBLE, CAUBLE & SELVIG, LLP


By:  *s/Christopher L. Cauble*
Christopher L. Cauble, OSB No. 96237
Rachele R. Selvig, OSB No. 095016
CAUBLE, CAUBLE & SELVIG, LLP
111 SE Sixth St.
Grants Pass, OR 97526
Telephone: (541) 476-8825
Facsimile: (541) 471-1704

Joseph M. Alioto, SBN #42680
*Admitted Pro hac vice*
jmalioto@aliotolaw.com
ALIOTO LAW FIRM
One Sansome Street
San Francisco, CA 97104
Telephone: (415-) 434-8900
Facsimile: (415) 434-9200

SEVERAID & GLAHN, PC
Ronald H. Severaid, SCBN #78923
*Pro hac vice pending*
Rhseveraid@sbcglobal.net
Carter Glahn, CSBN #242378,
*Pro hac vice pending*
cglahn@sbcglobal.net
1787 Tribute Road, Suite D
Sacramento, CA  95815
Telephone: (916) 929-8383
Facsimile: (916) 925-4763

Of Attorneys for Plaintiff